UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 18-cr-20767 |
| Plaintiff, | ) | Hon. Robert N. Scola |
| | ) | |
| vs. | ) | |
| | ) | |
| JUAN PABLO MOSQUERA OVIEDO | ) | |
| | ) | |
| | ) | |
| Defendant | ) | |
| _____/ | | |

MEMORANDUM IN SUPPORT OF DOWNWARD VARIANCE AND REQUEST FOR
TIME-SERVED & VOLUNTARY DEPARTURE FROM THE UNITED STATES

JUAN PABLO MOSQUERA OVIEDO respectfully requests that your Honor sentence him to a period of time-served of *1227 days* (3 years 4 months and 8 days *or* 40 months and 8 days) and that that your Honor release Mr. Mosquera from custody at the time of sentencing and permit Mr. Mosquera to voluntarily depart the United States to Colombia, at his own expense, by or before midnight February 16, 2022.

As set forth herein, application of the 3553(a) factors supports a sentence of time-served in this case and demonstrates that a Guidelines sentence is neither an appropriate nor a meaningful barometer for measuring Juan Mosquera or his conduct in this case. Indeed, a Guidelines sentence would require Juan to spend an additional *1157 days* or 38 months in a federal prison and likely an additional 90 days in an immigration detention center (*1247 days* total) prior to his deportation to his home in Colombia.

In fact, a Guidelines sentence is wholly unwarranted and greater than necessary in this case. *Gall v. United States,* 552 U.S. 38 (2007) (reinforcing the significance of punishment that is

1

sufficient but not greater than necessary).[1] Since his arrest in Colombia on October 3, 2018, Juan has now served more than 1000 days in prisons. Prior to his extradition, Juan served time in the La Picota in Bogota, Colombia which is universally recognized as a prison with horrible living conditions.[2] And, at FDC-Miami Juan suffered from COVID-19 before vaccines became widely available to the global community. Juan was unable to witness the birth of his third daughter (who he has never met). Juan has not seen any of his family members who all reside in Colombia (his children, the mother of his children, his brother, his mother, or his aunt and uncle). Juan's distinguished career in law enforcement (to which he devoted 15 of the 35 years of his life) is now destroyed. In fact, when Juan returns to Colombia, his opportunities for gainful employment will be extraordinarily limited.

### A.  <u>Section 3553(a)(1): History and Characteristics of Juan Mosquera</u>

Juan Pablo Mosquera Oviedo is a Colombian national with no ties to the United States, and a father of three children under the age of 10. Juan was born in El Spinal, Tolima, Colombia and grew up poor. At the age of 5, his father abandoned him and his brother and his mother forcing

---

[1] This Circuit has repeatedly affirmed sentences well below the applicable Guidelines. *See e.g. United States v. Anderson*, 267 Fed. App'x 847 (11th Cir. 2008) (affirming sentence of probation with home-confinement for white collar defendant where Guidelines were 18 to 24 months and prosecutor was requesting 18 month sentence, explaining that under Gall, district courts had wide discretion at sentencing); *United States v. Mathis*, 186 Fed. App'x 971 (11th Cir. 2006) (50% percent variance from the top end of Guidelines affirmed in Hobbs Act extortion and obstruction case); *United States v. Gray*, 453 F.3d 1323 (11th Cir. 2006) (affirming 72 month sentence even though low end of Guidelines was 151 months, more than double the sentence imposed); *United States v. Halsema*, 180 Fed. App'x 103 (11th Cir. 2006) (unpublished) (affirming 24 month sentence even though Guidelines were 57 to 71 months, an almost 60 percent reduction from the low end and two thirds of the high end); *United States v. Williams*, 435 F. 3d 1350 (11th Cir. 2006) (90 months imprisonment was sufficient, but not greater than necessary to punish, deter, and rehabilitate defendant even though low end sentence was 188 months, a more than 50 percent reduction).

[2] See *United States v. Lopez-Giraldo*, CRIMINAL ACTION 1:17-CR-395-MLB-JKL, at *40 (N.D. Ga. Nov. 4, 2021) ("It is undisputed that the conditions at La Picota are deplorable: it is overcrowded and filthy, detainees lack access to personal hygiene items, the food is inedible and the portions inadequate, and the guards are aggressive with inmates."); *see* **Exhibit A**. "Report Describes Appalling Conditions in Bogota Prisons" (identifying Picota as a prison with poor living conditions.).

Juan and his identical twin brother to live with their aunt and uncle. In fact, up until Juan was 13 years old, Juan's father denied that Juan and his brother were even his children.

In the face of these undeniable hardships, Juan finished high school and then joined and graduated from the police academy. As a law enforcement officer, Juan served his community for 15 years and eventually became a captain in the Colombian National Police (CNP). Captain Mosquera received numerous *recent* commendations for his participation in arrests and seizures. Among other things:

- A special recognition for Mr. Mosquera's work and police expertise in seizing hallucinogenic substances, specifically his involvement in the seizure of 690 kilograms of cocaine in international waters.

- A special recognition for Mr. Mosquera's excellent performance of the assigned duties, specifically his involvement in the seizure of 560 kilograms of cocaine and the arrest of five individuals.

- A special recognition for Mr. Mosquera's arrest of an individual to be extradited to the United States for the crime of trafficking a controlled substance to the United States.

- A special recognition for Mr. Mosquera's participation and leadership in the seizure of 455 kilograms of cocaine that was destined for Brazil.

- A special recognition for Mr. Mosquera's work, and police expertise, specifically relating to the seizure of 399 kilograms of cocaine, 141 grams of marijuana, and seizure of an unlawful weapon.

- A special recognition for Mr. Mosquera's investigative work, specifically relating to his participation in the arrest of three individuals, and the seizure of 945 kilograms of cocaine and 10 kilograms of amphetamines destined for the United States.

- A special recognition for Mr. Mosquera's participation and leadership in the seizure and destruction of 1,197 kilograms of cocaine.

- A special recognition for Mr. Mosquera's participation and leadership in the seizure and destruction of 49 kilograms of cocaine from a sailboat. Indeed, this seizure resulted in the arrest of multiple individuals, including Kylan Patrick Liljebeck. On or about December 21, 2018, a grand jury returned an indictment against Kylan Patrick Liljebeck, Ivan Edgardo Ramirez Gonzalez, and Jamin Cordoba-Rengifo in Case No. 18-cr-20895-CMA in this District resulting from a March 2018 seizure.

3

*See* **Exhibit B-1,** Compilation of Mr. Mosquera's Commendations, and **Exhibit B,** Declaration of Daniel Hentschel, Esq.

Tragically, despite these impressive professional accomplishments and Juan's demonstrated commitment to protecting his community from narco-traffickers and other serious criminal conduct, Mr. Mosquera elected to engage in the criminal conduct to which he plead guilty in this case. Yet, Mr. Mosquera's brief foray into criminality (less than a month) represents the first time Mr. Mosquera stands alone as a marked deviation from an otherwise law-abiding life and a career devoted to protecting his community. *See Pepper v. United States*, 131 S. Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted) ("to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."); *see also* 18 U.S.C. Section 3553(a)(5) (stating that 3553 factors require the court to consider, among other things, the policy statement concerning aberrant behavior departure").

B. **Section 3553(a)(1): Nature and Circumstances of the Offense**

Mr. Mosquera has accepted responsibility for his offense conduct as set forth in Mr. Mosquera's factual proffer. See ECF No. 71.  Mr. Mosquera deeply regrets his conduct which has now cost him his career in law enforcement and Mr. Mosquera realizes he made a terrible series of mistakes by seeking to sell information about DEA targets through a known drug trafficker Davila-Bonilla and that his conduct was an abuse of his position as a captain of a specialized police unit and was intended to undermine and (had the potential to seriously undermine) a DEA investigation.  Nonetheless, in considering the nature and circumstances of Mr. Mosquera's specific offense conduct it is critical to highlight several salient factors which remove this case

from the heartland of most obstruction offenses prosecuted under the omnibus clause of 18 U.S.C. Section 1512(c)(2).

*First,* Mr. Mosquera's conduct took place entirely outside of the United States and began and ended within a period of less than three weeks and involved a total of two in person meetings (one in Chicoral prior to August 27, 2018, and one in Palmira on August 30, 2018) and a series of text messages and phone calls with Davila-Bonilla.

*Second,* Mr. Mosquera never provided any names of any DEA informants or confidential sources to his co-conspirator Davila-Bonilla or anyone else. Instead, Mr. Mosquera provided information to Davila-Bonilla about surveillance techniques used by his vetted unit to surveil P.L. in exchange for money. That information included the locations of certain surveillance, including addresses and a restaurant, aliases used by P.L., and a photo of the target P.L.

*Third,* Mr. Mosquera never provided any names of persons whose phones were intercepted to his co-conspirator Davila-Bonilla or anyone else or provided any information about how to circumvent an intercept to his co-conspirator Davila-Bonilla or anyone else.

*Fourth,* as part of the offense, Mr. Mosquera never destroyed any documents or removed any documents which would otherwise be seen by a grand jury or a petit jury

*Fifth*, as part of the offense, Mr. Mosquera never intimated any witnesses. Similarly, Mr. Mosquera never intended to endanger any witness or informant. Nor was any witness or informant ever placed at risk due to Mr. Mosquera's conduct

*Sixth,* as part of the offense, Mr. Mosquera never testified falsely or provided false information to impede or influence a proceeding.

**Seventh,** as part of the offense, Mr. Mosquera never received any money from his offense conduct and the amount of money which was ultimately paid to Davila-Bonilla was Seven Thousand dollars ($7,000.00).

**Eighth,** as part of the offense, Mr. Mosquera never sought to protect Davila-Bonilla or his drug trafficking organization.

**Ninth,** as part of the offense, Mr. Mosquera was never involved in any of the underlying narco-trafficking activities. Nor did Mosquera seek profit from Davila's drug-trafficking activities (or any other person's drug trafficking activities) in exchange for providing assistance to Davila or any other drug-trafficker.

**And, Tenth,** no actual or imminent proceeding was actually obstructed, impeded, or influenced. The existence of a grand jury proceeding, or an imminent Miami "request" was fictitious.

C. **The Kind of Sentence and the Sentencing Range Established as set forth by the Guidelines (§3553(a)(4))**

Mr. Mosquera's Guideline range is 78-87 months. That range is driven almost entirely by a quantity of drugs 50kg to 150kg that Mr. Mosquera never distributed, agreed to distribute, and which, incredibly, Mr. Mosquera *seized* as part of a Colombian National Police take-down in March of 2018 prior to the commencement of the conspiracy to which he plead guilty in this case*. See* **Exhibit E** (filed under seal)

"The legislative history [of the Federal Sentencing Guidelines] reflects that it was not Congress' aim to straitjacket a sentencing court, compelling it to impose sentences like a robot inside a Guidelines' glass bubble, and preventing it from exercising discretion, flexibility or independent judgment." *United States v. Lara*, 905 F.2d 599, 604 (2d Cir.1990). Instead, in

6

promulgating the Guidelines, the Sentencing Commission underscored that district courts must retain the discretion and flexibility to fashion individualized sentences:

> The Committee does not intend that the guidelines be imposed in a mechanistic fashion. It believes that the sentencing judge has an obligation to consider all the relevant factors in a case and to impose a sentence outside the guidelines in an appropriate case. The purpose of the sentencing guidelines is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender, not to eliminate the thoughtful imposition of individualized sentences.

S.Rep. No. 225, 98th Cong., 2d Sess. 52, reprinted in 1984 U.S.Code Cong. & Admin.News 3182, 3235 (Legislative History).

This is especially true where, as here, there is an additional 28-point bump based entirely on the amount of drugs computed under §2D1.1(a)(5),(c)(3). By contrast, in § 2A, governing violent crimes, there are no double-digit enhancements. Examples of other double-digit enhancements in the Guidelines include a 15- level enhancement for trafficking in portable rockets (§2K2.1(b)(3)(A)) and for boarding airplanes with bombs (§2K1.5(b)(1)), and there are 12-level enhancements for committing a felony to promote terrorism (§3A1.4(a)) and for obstruction of justice related to terrorism (§2J1.2(b)(1)(C)). As such, strapping Mr. Mosquera with a 28-level enhancement based almost entirely on the drug trafficking guidelines and based on drugs that Mr. Mosquera *seized prior to his offense conduct* is unwarranted.

### D. Section 3553(a)(6): A Sentence of Time Served is Warranted in this Case to Avoid Disparities and to Avoid a Miscarriage of Justice

The Government advocated for a sentence of time served for Mr. Mosquera's co-defendant, Mr. Davila-Bonilla (also known as "El Gordo") and this court sentenced Mr. Davila-Bonilla to time-served of 33 months. Mr. Davila-Bonilla is a convicted international drug trafficker and money launderer. He has achieved the unique honor of being convicted of felonies in three (3)

countries: Italy, Germany, and now, the United States. Simply put, he is a bad guy. A few examples of Mr. Davila-Bonilla's extensive criminal conduct are worth highlighting:

- Between approximately 2002-2005, and 2009-2013, Davila sent thousands of kilograms of cocaine from Colombia to Europe via commercial aircraft (in cargo compartment or cargo pallet). Davila obtained cocaine in Colombia and sent approximately 20-80 kilograms at a time from Bogota to Madrid and Amsterdam. Davila would then receive his payment in Colombia once the cocaine arrived in Europe (by working with a money laundering network. Davila worked with partners in Europe where each side would put up half the value of the cocaine and Davila would earn a 30% delivery fee.

- In addition to transporting cocaine via commercial aircraft, Davila brokered cocaine deals with drug traffickers shipping cocaine on container ships from ports in Colombia to destinations in Europe. Davila added his own cocaine to these shipments in cargo containers (usually approximately 20-30 kilograms as part of larger multi-hundred-kilogram loads). Davila engaged in this conduct from 2006-2008 and in 2013. Davila participating in transporting thousands of kilograms of cocaine in this manner.

- Davila has laundered millions of dollars in drug trafficking proceeds between Europe (Spain, Italy, France, Belgium, and Holland) and Colombia. Davila charged a percentage of the total amount laundered to connect drug traffickers in Europe with business owners in Colombia. Davila usually charged 13-14% and kept 2-3% after paying expenses and other members in the conspiracy. Between 2018 and 2019, Davila laundered approximately 6-7 million euros (at approximately 500,000 – 800,000 euros per transaction).

- Davila engaged in drug trafficking activity (using both commercial aircraft and container ships) while on house arrest in Italy.

- In or around December 2018, Davila was involved in a drug trafficking transaction where a large load of cocaine destined for Europe was stolen.

- On several occasions when Davila purchased cocaine in Colombia, Davila saw people who were being held captive in relation to drug debts or other reasons.

Additional information about Mr. Davila is included in **Exhibit C** which has been filed under seal. One article from 2013 describes Mr. Davila-Bonilla's drug-trafficking offense in Italy as follows:

> Colombian police have captured a drug trafficker in Bogota with close ties to the Italian mafia, shining a light on one of Europe's principal trafficking routes.

8

Juan Carlos Davila Bonilla, alias "El Gordo," allegedly oversaw shipments of cocaine from Colombia to Italy, working with criminal groups on both continents, El Espectador reported.

Colombian authorities say El Gordo worked closely with Iacomino Tommaso, an Italian who was arrested in Bogota in February. Tommaso is believed to have connections with mafias in Sicily and Palermo that sell cocaine on the local market and export it around Europe.

According to the authorities, El Gordo also worked with a local faction of neo-paramilitary drug gang the Urabeños, which provided security for his operations.[3]

But, unlike Mr. Mosquera, Mr. Davila-Bonilla was able to cooperate with the government because, unlike Mr. Mosquera, Davila-Bonilla knows lots of drug traffickers and money launderers. Given these stark differences between Davila and Mr. Mosquera, it would be fundamentally unfair and a miscarriage of justice to punish Mr. Mosquera with a Guidelines sentence simply because Mr. Mosquera was not in the same position as Mr. Davila was to cooperate in this case. Indeed, doing so is the equivalent of punishing Mosquera because Mosquera has not had the same opportunities as Mr. Davila has had to interact with dozens, if not hundreds, of drug-traffickers and money launderers. Mr. Davila has led a criminal lifestyle for decades. Mr. Mosquera was engaged in criminal conduct for less than a month.

At least two other cases from this District involving law enforcement officer-defendants further reinforce the drastic disparities that a low-end Guideline sentence would promote in this case. *See* 18 U.S.C. Section 3553(a)(6).

---

[3] https://insightcrime.org/news/brief/link-italian-mafia-colombian-cartels/

First, in *U.S. v. Raul Iglesias,* 12-cr-20533-CMA (S.D. Fla.)[4], a police officer was charged with and convicted at trial of two counts of violating the civil rights of two persons, one count of conspiracy to possess with intent to distribute powder and crack cocaine, one count of possession with intent to distribute powder cocaine, one count of obstruction of justice, and three counts of making false statements. The convictions were based on evidence at trial that Mr. Iglesias planted drugs, stole cash from evidence lockers seized from defendants, paid confidential informants with drugs, and lied to the FBI.  Prior to sentencing, probation calculated his Guideline range as a level 25 (57-71) months and Mr. Iglesias was ultimately sentenced to 48 months. A year later, law enforcement discovered that Mr. Iglesias had also violated a protective order and had leaked the sensitive discovery in the case to others which resulted in Mr. Iglesias' guilty plea for violating the federal contempt statute. *See U.S. v. Raul Iglesias,* 13-cr-20934-CMA (S.D. Fla.). Mr. Iglesias was sentenced to 18 months. His combined sentences of 18 months and 48 months resulted in a total of 66 months which still falls 12 months short of the 78 months sentence the government proposes in this case for Mr. Mosquera who has already served more than 1000 days in prisons.

Second in *U.S. v. Roderick Flowers & Keith Edwards, et al.* 20-cr-20266-PCH (S.D. Fla.)[5] two Miami Dade police officers Roderick Flowers and Keith Edwards plead guilty to conspiracy to traffic cocaine. The two men admitted that they used their positions as police officers to act as muscle for a cocaine shipment. The two men met were sentenced to one year and three months

---

[4] https://www.miamiherald.com/latest-news/article1948546.html

[5] *See also U.S. v. Vega-Hernandez et. al.,* 17-cr-20908-RNS (S.D. Fla.) (imposing sentences of no more than 30 months for each of the defendants for transporting cocaine on an airplane. The conspiracy resulted in the actual transportation of 17 kilograms of cocaine on a U.S. registered aircraft.).

and to remain on house arrest for 2 years. A copy of the factual proffers of Mr. Flowers and Mr. Edwards' is attached herein as **Exhibit D.** [6]

Although Mr. Mosquera's conduct was unmistakably serious, none of his conduct was as egregious as the conduct committed by these defendants, especially Mr. Iglesias who was convicted twice, and therefore, even a low-end Guidelines sentence in this case would not promote fairness in sentencing.

### <u>CONCLUSION</u>

For each of these reasons, Mr. Mosquera respectfully submits that a sentence of time served is eminently appropriate. Mr. Mosquera therefore requests that your Honor release him from custody at the time of sentencing and permit Mr. Mosquera to voluntarily depart the United States to Colombia, at his own expense, by or before midnight February 16, 2022.

---

[6] *See also* https://www.miamiherald.com/news/local/article254219793.html

Respectfully submitted,


*/s/ Andrew S. Feldman*
Andrew S. Feldman
afeldman@feldmanpllc.com
FELDMAN FIRM PLLC
150 Southeast 2nd Avenue, Suite 600
Miami, Florida  33131
Telephone (305) 714-9474

*/s/ Daniel Hentschel*
Daniel Hentschel
Hentschel & Lanza PLLC
2665 South Bayshore Drive
Ste 220
Miami, FL 33133
305-440-4015
Fax: 305-440-4018
Email: dhentschel@hxl-law.com
***Attorneys for Defendant***


<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I filed the foregoing via CM/ECF which was served on all counsel of record authorized to receive service.

*/s/ Andrew S. Feldman*