UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CR-20767-SCOLA

UNITED STATES OF AMERICA

v.

JUAN PABLO MOSQUERA OVIEDO,

    Defendant.

_____/

## UNITED STATES' SENTENCING MEMORANDUM

Defendant Juan Pablo Mosquera Oviedo has pleaded guilty to obstruction of justice based upon his ill-fated attempt to sell secret information about pending U.S.-Colombian law enforcement investigations to criminal organizations. Among others, one underlying investigation that he sought to undermine focused on an American named P.L. and events involving the attempted transportation of 50 to 150 kilograms of cocaine to the United States. Because the underlying drug crime was serious, Mosquera's advisory Guidelines range is 97 to 121 months. The government respectfully requests that this Court impose a low-end Guidelines sentence of 97 months.

### Factual and Procedural Background

Mosquera admitted to his guilt on Counts 1 (conspiracy to obstruct justice, in violation of 18 U.S.C. §§ 1512(c)(2) and (k)) and 2 (attempt to obstruct justice, in violation of 18 U.S.C. §§ 1512(c)(2) and 2) based on the following facts (DE71). Beginning in or around July 2017, Mosquera, a longtime Colombian National Police officer, joined a special investigations unit that conducted anti-narcotics operations in conjunction with the U.S. Drug Enforcement Agency (DEA) (DE71:2). In March 2018, Colombian law enforcement, including

Mosquera's unit, and the DEA seized 49 kilograms of cocaine from a sailboat scheduled to depart Colombia (*id.*).[1] The authorities arrested K.P.L. and two other persons associated with that seizure (*id.*).

In August 2018, Juan Carlos Davila Bonilla, a Colombian drug trafficker, met Mosquera after an acquaintance introduced the two men (DE71:2). In in-person meetings and other communications, Mosquera gave Davila information about pending drug trafficking investigations (*id.*). In particular, he provided Davila with intelligence about an ongoing investigation into a fugitive from the United States named P.L., including P.L.'s known aliases and surveillance locations where investigators had monitored P.L. (*id.*).

In September 2018, after the DEA began to suspect that Mosquera was leaking information, DEA agents "falsely advised Mosquera that an indictment and extradition order for P.L. were forthcoming in Miami, Florida" (DE71:2). Shortly after learning this information, Mosquera advised Davila that P.L. was "hot" (DE71:3)—i.e., Mosquera tipped Davila off about what Mosquera believed to be P.L.'s imminent arrest and extradition. On a September 6, 2018 call, Davila shared that a Miami "request" was imminent and that P.L. should leave Colombia with a person whom Davila believed to be an associate of P.L. (although that individual in fact turned out to be a DEA confidential source) (*id.*).

The Presentence Investigation Report (PSI) contains additional details about the offense conduct, which the government discovered through recorded conversations between several DEA sources and Davila. In those meetings, Davila shared that Mosquera had 22

---

[1] The total amount that counts as relevant conduct for Guidelines purposes is 50 to 150 kilograms because the investigators provided additional kilograms of sham cocaine for that trip (Def. Ex. E:1 (discussing provision of look-alike cocaine)).

"files"—meaning, 22 investigations—that he was willing to discuss (PSI ¶ 8). In exchange, Mosquera wanted to be paid approximately $7,000 for an initial meeting and an additional $33,000 for his information (PSI ¶ 9). When the DEA sources asked about P.L. specifically and posed as associates of P.L., Davila conveyed that he learned from Mosquera that P.L. was in Colombia with fraudulent Colombian identification documents (PSI ¶ 11). According to Davila, the DEA planned to ask Colombia to expel P.L. based on his false documents, which would allow him to be sent to the United States and arrested on a pending probation violation warrant (PSI ¶¶ 11, 14).

In September 2018, a grand jury in this district indicted Mosquera and Davila for their joint effort to obstruct an official proceeding against P.L. (DE3). Mosquera was extradited to face these charges. Mosquera initially sought a bench trial but ultimately chose to plead guilty on the first day of the scheduled trial in October 2021 (DE63; DE69).

In December 2018, a grand jury returned an indictment against K.P.L. and his two co-conspirators based on the March 2018 cocaine seizure (DE71:3). P.L., who was not named in that indictment, was captured in Spain by Spanish law enforcement (*id.*).

## Discussion

**I.    Mosquera's Advisory Guidelines Range Is 97 to 121 Months' Imprisonment.**

As an initial matter, Mosquera's Sentencing Memorandum misstates the advisory Guidelines range determined by the PSI to be 78 to 87 months' imprisonment (DE86:6). The PSI calculated Mosquera's total offense level to be 30, which stemmed from taking the Guidelines offense level for a 50- to 150-kilogram cocaine offense (34, *see* USSG § 2D1.1(c)(3)), subtracting 6 points as directed by USSG §§ 2J1.2(c) & 2X3.1(a)(1), and then adding 2 points pursuant to USSG § 3B1.3 because Mosquera abused a position of trust (PSI

¶¶ 27-37). Mosquera belonged to Criminal History Category I (PSI ¶ 40). These two characteristics resulted in an advisory imprisonment range of 97 to 121 months (PSI ¶ 65).

Part of the explanation is that Mosquera appears to assume that a 2-point USSG § 3E1.1(a) reduction for acceptance of responsibility applies. An offense level of 28 and criminal history category of I result in a 78- to 97-month (not 87) imprisonment range. However, the PSI reported that Mosquera has not yet provided an acceptance of responsibility statement to Probation (PSI ¶ 26). His sentencing memorandum does not argue that he has provided such a statement, nor does it expressly object to the absence of an acceptance adjustment in the PSI.

Based on the current PSI range, the government recommends a low-end Guidelines sentence of 97 months' imprisonment.[2]

## II. The 18 U.S.C. § 3553(a) Factors Favor a Guidelines Sentence.

A district court should consult the Sentencing Guidelines Manual and consider the advisory Sentencing Guidelines range for an instant offense before pronouncing its sentence. *United States v. Crawford*, 407 F.3d 1174, 1178-79 (11th Cir. 2005). After calculating the Guidelines range, a district court next should consider and balance the sentencing factors in § 3553(a) to determine a "reasonable" sentence. *United States v. Talley*, 431 F.3d 784, 786 (11th Cir. 2005).

---

[2] If the Court grants Mosquera an acceptance of responsibility adjustment at his sentencing hearing, the government will consider adjusting its recommendation based on the new advisory range. Although Mosquera's sentencing memorandum asserts that the government has proposed a 78-month sentence (DE86:10), the government had not made a recommendation regarding sentencing before his filing, and that figure sits outside the current advisory Guidelines range. To be clear, the government is not advocating for a downward variance.

Section 3553(a) requires a sentencing court to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of that subsection. 18 U.S.C. § 3553(a). This case does not feature particularly unusual aggravating or mitigating factors. Thus, it warrants a within-Guidelines sentence. Below, the government highlights some of the most salient factors favoring its recommendation.

a. **Section 3553(a)(1)**

The first factor for the Court's consideration is the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Here, the nature and circumstances of the offense were quite serious. The DEA relies heavily on the Colombian National Police when it operates in Colombia. In fact, the DEA cannot engage in law enforcement operations in that country without cooperation from the Colombian police. DEA agents rely on their Colombian counterparts to investigate international drug trafficking organizations in a dangerous and uncertain environment. That is why trust is absolutely essential, and why the corruption of law enforcement not only can compromise investigations, it may endanger lives.

Furthermore, the amount of narcotics involved in this case is substantial. As Mosquera admitted in his factual proffer, there was sufficient evidence to establish that the P.L. investigation he sought to obstruct involved between 50 and 150 kilograms of cocaine (DE71:3), worth over $1 million. A person who directly traffics that quantity of narcotics would be subject to a base offense level of 34, *see* USSG § 2D1.1(c)(3), which acknowledges the seriousness of that conduct. Indeed, subsection (c)(3) is the third-highest out of seventeen levels available under that Guideline.

Mosquera advances several potential mitigating factors, but they do not favor a

5

downward variance. He spends extensive time recounting his decorated law enforcement career before he broke bad (DE86:3-4; Def. Ex. B). But those facts are a double-edged sword. First, as the Guidelines acknowledge, the fact that Mosquera attempted to obstruct justice while employed as a police officer, sworn to uphold the law, and that he used his position of public trust to do so, is an *aggravating* factor. *See* USSG § 3B1.3; (PSI ¶ 32). People placed in positions of public trust must be held to a higher standard. Mosquera did not just break the law, he dishonored his oaths to his profession and his duty to serve the citizens of Colombia. Second, Mosquera's record of stable employment and family life demonstrates that his crime was not an act of desperation or some other arguably sympathetic impulse. On the contrary, the only apparent motive for his actions was greed. Moreover, it was not a split-second occurrence that one might see as a single moment of poor judgment. Mosquera had two meetings with Davila and communicated with him over a period of multiple weeks sharing information about the P.L. investigation. To the extent that Mosquera puts any stock in the fact that his "brief foray into criminality" lasted "less than a month" (DE86:4), it is worth remembering that the DEA quickly detected the leak and arrested Mosquera by October 2018. He had not affirmatively withdrawn from his agreement with Davila or otherwise evinced the kind of second thoughts that might lead a remorseful person to try to undo the damage from their mistakes before his arrest.

    b.  <u>Sections 3553(a)(2)(A) and (a)(2)(B)</u>

The next factor to consider is the "need for the sentence imposed" "to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). This factor captures the "'just deserts' concept, which carries the need for retribution, the need to make the punishment fit the crime, and the need

6

not just to punish but to punish justly." *United States v. Irey*, 612 F.3d1160, 1206 (11th Cir. 2010) (en banc) (internal quotation marks omitted). Accordingly, the more serious the crime, the "greater the need for retribution and the longer the sentence should be." *Irey*, 612 F.3d at 1206.

A time-served sentence would not promote respect for the law or correspond to the seriousness of the offense conduct. Consider a hypothetical scenario where a police officer obstructs a drug investigation involving less than 5 kilograms of cocaine—a mere *tenth* of the quantity at issue here. That officer would be subject to a base offense level of 22, *see* USSG §§ 2D1.1(c)(6), 2X3.1. Even if we assume that the abuse of trust enhancement and acceptance adjustment cancel out, that defendant would have a Guidelines range of 41 to 51 months—essentially the sentence that Mosquera requests here.

The need "to afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), similarly favors a Guidelines sentence. "[T]he purpose of the cross-referencing to § 2X3.1 [in § 2J1.2(c)] is to provide proportionality in the sentencing of such offenses." *United States v. Brenson*, 104 F.3d 1267, 1285 (11th Cir. 1997). That purpose is ill-served by downward variances, which would flatten the range of punishments under this Guideline. At worst, if the penalties for obstructing a 50-kilogram cocaine investigation are no different than for obstructing a 5-kilogram case, it would encourage "in for a penny, in for a pound" thinking among those who attempt to obstruct justice.

Of course, as Mosquera notes, he did not participate in the underlying drug trafficking activity directly (DE86:5-6). The Guideline accounts for the proposition that obstruction may be, in some cases, less harmful (or at least less dangerous) than the underlying conduct by directing the deduction of 6 offense levels in USSG § 2X3.1(a)(1). Similarly, Mosquera

7

emphasizes that he did not destroy documents, intimidate witnesses, or expose confidential informants. However, the absence of those features is not especially mitigating; on the contrary, the *presence* of those features might well justify additional, more severe charges, and the Guidelines provide various bumps when those factors are present. *See, e.g.*, USSG § 2J1.2(b)(1)(B) (8-level increase for causing or threatening injury to a person); *id.* § 2J1.2(b)(2) (3-level increase for "substantial interference with the administration of justice"); *id.* § 2J1.2(3) (2-level enhancement for destroying or altering records).

One final note: although Mosquera denies "receiv[ing] any money from his offense conduct" (DE86:10), he expressly admitted in a post-*Miranda* interview that he received a payment of approximately 13 million Colombian pesos for his information (Gov. Ex. 1:10 (Mosquera interview transcript)).

### c. Section 3553(a)(6)

Finally, this Court should endeavor "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Mosquera urges this Court to impose a downward variance to account for a supposed disparity between him and Davila or between him and other officers accused of public corruption.

However, "[d]isparity between sentences imposed on codefendants is generally not an appropriate basis for relief on appeal." *United States v. Regueiro*, 240 F.3d 1321, 1325-26 (11th Cir. 2001). The reason is that codefendants often are "not similarly situated"—for example, when they are subject to different advisory Guidelines ranges. *United States v. Azmat*, 805 F.3d 1018, 1048 (11th Cir. 2015). For much the same reason, "[d]efendants who cooperate with the government and enter a written plea agreement are not similarly situated to a defendant

who provides no assistance to the government . . . ." *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009). "There is no unwarranted disparity even when the sentence the cooperating defendant receives is substantially shorter." *Id.* at 1101 (internal quotation marks omitted).[3]

Those basic principles address Mosquera's arguments. As for Davila, he and Mosquera are not similarly situated. Davila pleaded guilty earlier, which entitled him to acceptance of responsibility credit, and he provided substantial assistance in the government's pursuit of Mosquera. Indeed, it seems very possible that, without Davila's cooperation, Mosquera would have elected to go to trial himself. Mosquera, who "provide[d] no assistance to the government," finds himself in a different situation than Davila, and he cannot complain "when the sentence the cooperating defendant [Davila] receives is substantially shorter." *Id.* Mosquera advances the strained view that it would be unjust to sentence him to a higher term than Davila because it "punish[es]" him for "not [having] the same opportunities as Mr. Davila . . . to interact with dozens, if not hundreds, of drug-traffickers" (DE86:9). However, he misconceives the structure of the Guidelines and cooperation benefits. A Guidelines sentence does not punish someone for refusing to cooperate; it is the ordinary outcome and, in many cases, the appropriate penalty calibrated to the nature of the offense. The inability to obtain a benefit, which Mosquera has done nothing to earn, is not an "unwarranted" disparity under § 3553(a)(6).

---

[3] *Docampo* contrasted defendants who cooperated versus those who refused and went to trial, but the point remains valid. Cooperation entitles a defendant to substantial benefits that are not available to his erstwhile accomplices who do not provide substantial assistance. *See* Fed. R. Crim. P. 35(b); USSG § 5K1.1.

Mosquera also identifies two other recent cases, which—he claims—demonstrate that lower sentences are appropriate for similar acts of obstruction. But, as he candidly acknowledges in his memorandum, the first case involved a lower Guidelines range. *See* (DE86:10 (discussing a 48-month sentence in *Iglesias*, a case with a 57-to-71-month Guidelines range)). His other example, the 15-month sentences received by two defendants in *United States v. Flowers et al.*, involved an even lower 30-to-37-month Guidelines range. *See* Sentencing Transcript (DE168) at 5, *United States v. Flowers*, Case No. 20-cr-20266-PCH (S.D. Fla. Oct. 18, 2021) (attached as Gov. Ex. 2). Thus, neither one offers a particularly close analogy for this matter.

Past obstruction cases establish that a wide range of sentences are permissible. Thus, a low-end Guidelines sentence—which, under these circumstances, is 97 months—would not create a disparity with the universe of comparable offenders. *See, e.g.*, *Brenson*, 104 F.3d at 1272 (affirming 120-month imprisonment term for corrupt jury member with 121-to-151-month Guidelines range); *United States v. Pompey*, 17 F.3d 351, 353 (11th Cir. 1994) (affirming low-end, Guidelines sentence of 41 months for defendant who attempted to bribe a DEA agent). When corrupt officers do participate directly in illegal activity such as drug trafficking or violent crime, the penalties can be far stiffer. *See, e.g.*, *United States v. Martinez*, 862 F.3d 223, 248-49 (2d Cir. 2017) (affirming sentence of corrupt officer Tejada, who received a 216-month sentence), *vacated in part as to different defendant by Rodriguez v. United States*, 139 S. Ct. 2772 (2019); *United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001) (affirming convictions and sentence of an officer who participated in drug trafficking and was sentenced to over 290 months' imprisonment).

## Conclusion

This Court should impose a low-end Guidelines sentence of 97 months and deny Mosquera's request for a downward variance.

Respectfully submitted,

JUAN ANTONIO GONZALEZ
United States Attorney

By: /s *Jason Wu*
Jason Wu
Assistant United States Attorney
Court ID No. A5502299
99 N.E. 4th Street
Miami, FL 33132
Phone: (305) 961-9226
E-Mail: Jason.Wu@usdoj.gov

## Certificate of Service

**I HEREBY CERTIFY** that I caused the attached document to be electronically transmitted to the Clerk's Office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing.

/s *Jason Wu*
Jason Wu
Assistant United States Attorney